**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| Kigan Industry Co. Ltd., <br><br>                Plaintiff; <br><br>       v. <br><br> Good Sportsman Marketing, LLC and GSM Holdings, Inc., <br><br>              Defendants. | CIVIL ACTION NO. 3:25-cv-1431 <br><br> JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT WITH REQUEST FOR DAMAGES, PERMANENT INJUNCTIVE RELIEF, AND JURY DEMAND

Plaintiff Kigan Industry Co. Ltd. ("Kigan" or "Plaintiff"), by and through its undersigned counsel, hereby complains against Defendants GSM Holdings, Inc. ("GSM Inc.") and its subsidiary Good Sportsman Marketing, LLC ("Good Sportsman") (collectively, "GSM" or "Defendants"), and alleges as follows:

### JURISDICTION AND VENUE

1.      This action arises under the patent laws of the United States, Title 35 of the United States Code.

2.      This Court has subject matter jurisdiction over the claims alleged in this action that relate to patent infringement pursuant to the provisions of 35 U.S.C. §§ 271 and 281, and 28 U.S.C. §§ 1331 and 1338, at least because this action involves claims arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*.

3.      Defendants are subject to personal jurisdiction in this Court at least because Defendants engaged in actions in this District that form the basis of Plaintiff's claims and that have

created a real, live, immediate and justiciable case or controversy between Plaintiff and Defendants.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in this district, and a substantial part of the events giving rise to Kigan's claims occurred in this district.

## THE PARTIES

5.    Plaintiff Kigan Industry Co. Ltd. is a Korean Limited Company with its principal place of business at 52, Chowon-gil, Jillyang-eup, Gyeongsan-si, Gyeongsangbuk-do, 38449, Republic of Korea.

6.    Upon information and belief, Defendant GSM Holdings, Inc. is a Texas corporation with its principal place of business at 5250 Frye Road, Irving, TX 75061.

7.    Upon information and belief, Defendant Good Sportsman Marketing, LLC is a Texas corporation with its principal place of business at 5250 Frye Road, Irving, TX 75061.

## FACTUAL BACKGROUND

8.    Since its founding in 1978, Kigan has established itself as a global fishing rod parts maker that manufactures fishing products, including the world's best quality guides and reel seats. Kigan's products are sold across the United States, including Wisconsin, Texas, South Carolina, North Carolina, and Alabama.

9.    On March 1, 2016, the United States Patent and Trademark Office ("USPTO") duly and lawfully issued United States Design Patent No. D750,733 (the "'733 Patent"), titled "Fishing Rod Hook Keeper."

10.    Kigan owns all right, title, and interest in the '733 Patent.

11.    Upon information and belief, certain assets of Phenix Rods & Accessories ("Phenix")[1] were acquired by GSM Holdings, Inc. (the parent company of Good Sportsman Marketing LLC) in an Asset Purchase Agreement, after which Phenix ceased to exist as an entity. Before the acquisition, Phenix manufactured, used, sold, offered for sale, and/or imported into the United States fishing rods that infringe the '733 Patent.

12.    In March 2022, it came to Kigan's attention that Phenix was manufacturing, using, selling, and/or offering for sale United States fishing rods, using Essex-branded hook keepers (the "Accused Product"), which embody and infringe the '733 Patent.

13.    The design of the Accused Product is substantially the same as the design that is the subject matter of the '733 Patent. Below is a side-by-side visual comparison of the Accused Product on a Feather—Spinning Rod product, next to Figure 1 from the '733 Patent.

| Infringing Hook Keeper | Figure 1 of the '733 Patent |
|---|---|
|  | |

FIG. 1

14.    The Accused Product has no substantial non-infringing uses.

15.    Phenix's offer to sell the Accused Product infringes the '733 Patent.

---

[1] Plaintiff has filed suit against the Equityholders of the now defunct Phenix entity, Jeff Tseng, Jianwei Li, Vincent Borges, Eugene Estabrook, and Shuhua Qin in Case No. 2:25-cv-03792-CAS-MBK (CDCA).

16.    The design of the Accused Product is so similar to the design that is the subject matter of the '733 Patent that customers are likely to be deceived and persuaded to buy the Accused Product on the belief that they are actually buying products protected by the '733 Patent.

17.    On March 7, 2022, Kigan, through Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois"), sent a cease-and-desist letter to Phenix demanding that Phenix cease selling products using the Essex-branded Hook Keepers, and cease infringing Kigan's intellectual property rights, including the '733 Patent. Thus, Phenix had actual notice of the '733 Patent at least as early as March 7, 2022.

18.    On March 9, 2022, Mr. Jianwei Li, Phenix's supply chain coordinator, responded to Kigan's cease-and-desist letter, expressing interesting in exploring "cooperation opportunities with Kigan on rod components."

19.    However, Mr. Li's email included previous communications among Phenix employees, which revealed Phenix's intention to cover up its infringement by purchasing Kigan's hook keepers, instead of denying or otherwise addressing Kigan's infringement claim against Phenix.

20.    For example, on March 8, Mr. Gene Estabrook (Phenix's procurement manager) said "Simple solution is to buy five hundred of their hook keepers and use them on the feathers that solves the feathers," emphasizing that "just to appease them we could still buy some hook keepers…so they back off." Mr. Vince Borges said that in a previous situation, Phenix "bought like 1000 of his keepers…and [the person claiming patent infringement] never bugged us again."

21.    On March 15, 2022, Mr. Li followed up with Kigan, emphasizing that they "would like to do business with Kigan going forward and create a good healthy business relationship

between [their] two companies." Mr. Li then asked "how much [Kigan's] hook keepers cost per 1000 pcs" as well as the pricing on "other accessories such as guide sets and tip tops."

22.    On March 18, 2022, Mr. Estabrook mentioned that he would place an order with Kigan by stating that Phenix "would like to start with 3000 sets of the new Gen 5 guide sets and hook keepers. 2000 sets casting 1000 sets spinning for freshwater bass rods" and said Phenix "look[s] forward to working with [Kigan] in the future and creating a lasting relationship that benefits both of [their] companies."

23.    On the same day, Kigan asked Mr. Estabrook for "the estimated annual order volume," and Mr. Estabrook responded that "[i]f all goes well with the first purchase and performance is good th[e]n I would estimate 3 times that…This is only the beginning of our partnership we hope to grow it exponentially over the next few years. Hope that sounds like something you would be interested in."

24.    Kigan stressed that they "want a long-term partnership and are willing to provide you with quality products[] and will never treat [Phenix] unfairly even though [they] met on a bad issue, [and] will try to provide [Phenix] with a reasonable and mutually beneficial unit price."

25.    On March 21, Mr. Estabrook asked Kigan to "do [four] samples" for Phenix to "inspect both guides and blanks." He also clarified whether the parties' engagement in business would "take care of any problems that [they] had initially as long as [Phenix] no longer use[s] that other Hokie bird." Phenix "want[ed] to make sure that this would solve the problem for both of [them] and [they] can engage in a prosperous business from this point forward." He then followed up and asked whether the parties' business together would "appease the ownership to drop any future legal issues as long as [Phenix] no longer use[s] the hook keeper in question," and stated they "want to insure [they] are not building a relationship and purchasing product only to still have

a legal battle down the line. [Phenix] agree[s] to stop using said item out of respect to [Kigan] and its wishes."

26.    Kigan confirmed that it had "no desire to inflict a great deal of business damage" and "just want[ed] to prevent the distribution of copy products and recover the amount of damage [it has] already [sustained] through long-term transactions with" Phenix." Kigan also clarified whether Phenix wanted to cancel its transaction.

27.    The next day, on March 22, the parties agreed that they had entered into an agreement (the "Agreement"), under which Phenix would stop selling the infringing Essex-branded hook keepers (Phenix "agree[d] to remove the hook keeper off [their] rods that is infringement"), and they would engage in business together, "keep[ing] [their] arrangements just as mentioned." Accordingly, they confirmed that they "have an agreement and all legal matters will end per [their] arrangement." While the parties did not formally sign a contract, both parties agreed on the contract's essential terms. The parties agreed that Kigan would not bring a patent infringement claim against Phenix, in return for Phenix's offer to develop a "good healthy business relationship" with Kigan, by continuously purchasing products from Kigan, "start[ing]" with 3,000 sets of guide sets and hookkeepers. Thus, the parties had a meeting of the minds and understood and agreed upon the terms. This created an enforceable agreement. In fact, Phenix explicitly stated "we have an agreement."  Phenix also later confirmed that the parties had an agreement on July 10, 2023, when it stated the parties "came to a mutual agreement."

28.    As of the date that the parties entered the Agreement, Kigan invested and continues to invest significant time, labor, and materials toward developing samples for Phenix. Phenix continues to ask Kigan to develop samples, and Kigan has complied.

29.     For example, on April 18, 2022, Mr. Li stated that he "would like to see what [Kigan] can do with 4 piece travel rods," and offered to pay for the samples.

30.     On May 6, 2022, Mr. Estabrook assured Kigan that "If [Kigan] can produce a good multi piece travel rod for us we would be interested in buying rods as well as blanks."

31.     On May 8, 2022, Mr. Estabrook followed up stating "If you can produce a few samples that would be great," and directed that Phenix "would like to see some completed samples for updating [Phenix's] current models in [their] travel rod series." Kigan noted that "Phenix rods [were] still selling of rods equipped with copy product." Mr. Estabrook assured Kigan that "[i]f that's the case th[e]n it is product obtained before the cease and desist order went out." The next day, he further confirmed that "[a]ll new products were changed and discontinued no current rods have the hook keeper in question," and that Phenix had "successfully cease and desisted as far as are sales of the product with the part in question."

32.     Kigan then diligently continued developing models for Phenix.

33.     On June 8, 2022, Mr. Estabrook requested an annual order quantity from Kigan of "300 to 400 pieces per model 8 to 10 models; 3000 to 4000 per year."

34.     On July 19, 2022, Kigan told Mr. Estabrook that Phenix was "still promoting the photos of hookeeper[s] of Essex in the shopping mall of Phenix Rods Korea without deleting them," reiterating that it didn't "want the relationship between [them] to fall apart," and "believ[ed] [he] can solve it well." He responded by stating that they "could not stop Korean dealers that had stock on hand from selling the product there," and "could only guarantee that there would be no further infringement." Kigan pointed out that "every reviewer's saying hook keeper on [Phenix's] rod is very useful" and that "it's not a pleasant experience for [Kigan's] copycats to get good reviews." Mr. Estabrook stated that they would request, at the very least, "to stop promoting the

images of rods that have the hook keepers on them," and to "not take photos of discontinued versions as if they are current." He also stated that they would "send [the overseas distributors] new images to use with the new hook keepers [s]o it is not offensive any longer." He also expressed desire "to have something written up legally that as long as [Phenix] do[es] not violate the patent any further [they] are free from retribution."

35.    On October 4, 2022, Phenix indicated that it sent an agreement to Kigan.

36.    Over the next year, the parties continued doing business.

37.    On December 16, 2022, Kigan inquired about the timing of Phenix's next purchase, asking specifically about Phenix's "next order plan." Mr. Li told Kigan that Phenix was "facing excessive inventory in both the warehouse and production," and that it was "hard to guarantee the timing for the next order." However, Phenix thanked Kigan for its "excellent blank samples," but assured that the travel rods "are planned to be discussed again with the built sample at our meeting this month's end," and requested they "keep in close touch on that."

38.    Accordingly, Phenix consistently recognized the quality and hard work that Kigan put into developing samples for Phenix.

39.    On May 7, 2023, Kigan completed two developed samples for Kigan, MF711-4 and USB-C 790H-4, and continued working on another six samples.

40.    However, Phenix did not provide feedback on the samples for months. Kigan diligently checked in with Phenix on the samples multiple times.

41.    On July 10, 2023, Phenix once again pointed out and confirmed the parties' agreement with each other. Mr. Estabrook told Kigan's legal counsel that the parties "came to a mutual agreement to avoid any issues of a previous hook keeper," and promised that it would

"purchase more guide sets as [they] go," and would "continue to grow [their] mutual business together as friends."

42.    On July 12, 2023, Kigan asked whether Phenix received the MF711-4 and USB-C 790H-4 samples. Phenix confirmed it had, and asked Kigan to continue working on other samples.

43.    On September 12, 2023, Kigan asked Phenix again for its thoughts on the sample rods.

44.    On September 27, 2023, Phenix finally responded, stating it "would like another sample" and "everything seems to be fine" with a chart Kigan provided.

45.    On October 7, 2023, Phenix confirmed that Kigan should "continue with the rest of the samples."

46.    On November 16, 2023, Phenix said their "initial on the water testing went well," and "didn't have any issues with it."

47.    On information and belief, on December 15, 2023, GSM entered into an Asset Purchase Agreement with Phenix and its Equityholders, Jeff Tseng, Jianwei Li, Vincent Borges, Eugene Estabrook, and Shuhua Qin[2].

48.    On information and belief, the Agreement states that GSM would operate under the corporate name of Phenix. It further states that after the closing date, Phenix and Defendants would take steps to change Phenix's corporate name permanently. As a result of this Agreement, on information and belief, Phenix appears to no longer exist.

49.    On January 31, 2024, Mr. Li told Kigan that Phenix had been sold to GSM. The next day, Jennifer Rhodes introduced herself as the Project Manager for the Phenix brand, stated that GSM acquired Phenix, asked about the samples Kigan had been working on, and stated that

---

[2] GSM shared excerpts of the Agreement but not the full agreement with Kigan during settlement negotiations.

she "look[ed] forward to expanding upon the partnership that has been started with Kigan." She signed off the email expressing her "excite[ment] to work with" Kigan.

50.     On February 2, 2024, a sales manager from Kigan reached out to Ms. Rhodes and updated her regarding the infringement allegations between the parties. Kigan explained that "Phenix Rods took down all photos of the hook keeper and stopped using it," and that the parties had "negotiated that Kigan would no longer fight with Phenix Rods, and Phenix Rods would use Kigan guides and expand their use to more rod models."

51.     On February 14, 2024, Ms. Rhodes had not yet responded, so Kigan's sales manager followed up with Ms. Rhodes, asking questions about their ongoing project and whether Ms. Rhodes had checked the sample rods.

52.     On March 4, 2024, Ms. Rhodes had still not responded, so Kigan's sales manager followed up again.

53.     On March 5, 2024, Ms. Rhodes finally stated that "the quality of the Essex guides is very good," and she was "not aware of any issues with this supplier." She then said she would "discuss the priorities for new development" and let Kigan know how they could "help with those projects later this week."

54.     On March 6, 2024, Kigan responded and pointed out that "Phenix Rods promised to use Kigan guides more frequently," and that "Phenix Rods ha[d] only placed one order in the last two years, which [was] not in line with [Phenix's] promise."

55.     On March 12, 2024, Ms. Rhodes responded, stating that she researched the parties' history, and "want[s] to learn from the mistakes of the past so that [they] can move forward with a more cooperative and cordial relationship between Kigan and Phenix under GSM Outdoors." Ms. Rhodes stated that GSM was "eager to develop many new models for the Phenix brand," that

"Kigan can be an invaluable supplier for GSM," and expressed excitement at the rod samples Kigan would ship, asking for "an assortment of samples to reference for developing new rods…"

56.    On April 4, 2024, Kigan asked Ms. Rhodes "whether Phenix plans to expand their travel rod series and add more models," and expressed that "Kigan would like to be a long-term partner with Phenix Rods."

57.    On April 26, 2024, Kigan followed up on its earlier email, since Ms. Rhodes had not responded.

58.    On April 27, Ms. Rhodes stated that they were "shifting responsibilities between [their] Project Managers" and would transition Phenix to a new Project Manager.

59.    Hearing no response from Ms. Rhodes, Kigan followed up on May 27, and again on June 3, and June 18.

60.    During September 2024, Kigan and Doug Mann, of GSM, finally engaged in a discussion.

61.    On October 14, 2024, Kigan sent Mr. Mann a Notice of Infringement and Breach of Contract letter, listing the infringing models that Phenix had or has been selling, as well as Phenix's website links that still displayed the images that GSM had repeatedly promised to pull down.

62.    On February 21, 2025, Mr. Mann stated that GSM was "currently purchasing Kigan components [on its] RTS Series rods," but was "currently not in development of any new items…that would require the need for additional Kigan components." However, he stressed that "the communications should be between Kigan and GSM to forge a path towards growing the business relationship." On February 24, 2025, Mr. Mann stated that his colleague, Vincent Borges confirmed they would be using Kigan hook keepers on M1 and Feather series rods.

63. On March 13, 2025, representation for Kigan told Mr. Mann that Vincent had not responded to efforts to contact him, and was told to follow up. Kigan followed up on March 17, and again on March 19, and still has not received a response.

64. As set forth above, Defendants acknowledged and did not deny that the Accused Product infringed the '733 Patent. Further, the parties confirmed multiple times that they were in agreement with each other for Phenix to purchase products, through multiple orders, from Kigan. Phenix also confirmed that it had taken down the infringing images on its website.

65. However, as of the date of this Complaint, Phenix has only conducted one order from Kigan over the course of three years. This is far less than the "good healthy business relationship" that Phenix set forth and Kigan expected. Kigan has attempted to communicate with its contacts from GSM, but has received no response. Meanwhile, Kigan invested and continues to invest significant time, labor, and materials into developing samples for Phenix.

66. Further, the pictures of the infringing products are still in use on Phenix's website, despite Defendants' multiple promises that the images were removed. *See* https://www.phenixrods.com/product/m1-casting/.

67. In fact, on April 17, 2025, Kigan received an email from an entity called ETUOH, asking for approval from GSM to use ESSEX guides, indicating that GSM may still be using ESSEX-branded products, the brand name of the infringing hook keeper.

68. On May 5, 2025, Kigan asked GSM to share relevant sections of the Asset Purchase Agreement so that Kigan could determine the division of Phenix's assets and liabilities pursuant to the Agreement, since Phenix appears to no longer exist as its own entity. However, GSM declined to share the entire agreement and instead sent select excerpts of the Agreement, and suggested that Kigan amend its complaint to add Defendants Tseng, Li, Borges, Eugene Estabrook,

and Qin, the Equityholders of Phenix and parties to the Asset Purchase Agreement with GSM, because Phenix no longer existed as an entity. On information and belief, Kigan asserts its claims for relief against the Defendants as individual Equityholders of the now defunct Phenix.

69.     Defendants' acts complained of herein have caused Kigan to suffer irreparable injury to its business in excess of $1,000,000. Kigan will continue to suffer substantial loss and irreparable injury unless and until Defendants are enjoined form their wrongful actions complained of herein.

70.     Kigan is informed and believes and based thereon alleges that Defendants' acts complained of herein are willful and deliberate.

## COUNT I
## (DESIGN PATENT INFRINGEMENT) (35 U.S.C. § 271)

71.     Kigan repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

72.     This is a claim for patent infringement under 35 U.S.C. § 271.

73.     Defendants, and each of them, through their agents, employees, and servants knowingly, intentionally, and willfully have directly infringed—and continue to directly infringe—the '733 Patent by making, using, selling, and/or offering for sale products having a design that would appear to an ordinary observer to be substantially similar to the claim of the '733 Patent.

74.     Defendants' acts of infringement of the '733 Patent were undertaken without permission or license from Kigan.

75.     Defendants each had actual knowledge of Kigan's rights in the design claimed in the '733 Patent.

76.     Defendants, and each of them, have acknowledged the validity and enforceability of the '733 Patent. Accordingly, Defendants, and each of them, are estopped from contesting the validity and/or enforceability of the '733 Patent.

77.     Kigan's Fishing Rod Hook Keeper is well-known throughout the relevant industry, and Defendants' Accused Product is a nearly identical copy of Kigan's Fishing Rod Hook Keeper design.

78.     Accordingly, Defendants' actions constitute willful and intentional infringement of the '733 Patent.

79.     Defendants infringed the '733 Patent with reckless disregard of Kigan's patent rights. Defendants knew, or it was so obvious that Defendants should have known, that their actions constituted infringement of the '733 Patent. Defendants' acts of infringement of the '733 Patent were not consistent with the standards of commerce for their industry.

80.     As a direct and proximate result of Defendants' patent infringement, Defendants have each derived and received gains, profits, and advantages in an amount that is not presently known to Kigan.

81.     Pursuant to 35 U.S.C. § 284, Kigan is entitled to damages for Defendants' infringing acts, in the amount of Kigan's lost profits, and in an amount not less than a reasonable royalty, and treble actual damages together with interests and costs as fixed by this Court.

82.     Pursuant to 35 U.S.C. § 289, Kigan is entitled to recovery of Defendants' total profits from the sale of products that infringe Kigan's design patent rights.

83.     Based on the intentional, willful, and malicious nature of the acts of infringement alleged, Kigan is entitled to a determination that this case is exceptional.

84.     Pursuant to 35 U.S.C. § 285, Kigan is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

85.     Due to the aforesaid infringing acts, Kigan has suffered great and irreparable injury, for which Kigan has no adequate remedy at law.

86.     Defendants will continue to directly and/or indirectly infringe Kigan's patent rights to Kigan's great and irreparable injury unless enjoined by this Court. Kigan has no adequate remedy at law.

87.     Accordingly, Kigan is entitled to both a preliminary and permanent injunction against Defendants enjoining each of them from further acts of infringement of the '733 Patent.

## COUNT II
## (BREACH OF CONTRACT)

88.     Kigan repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

89.     On or about March 22, 2022, Kigan entered into a binding and enforceable agreement with Phenix and the Equityholders when they agreed that Kigan would not bring a patent infringement claim against Phenix, in return for Phenix's offer to develop a "good healthy business relationship" with Kigan, by continuously purchasing products from Kigan, "start[ing]" with 3,000 sets of guide sets and hookkeepers. Further, Phenix explicitly confirmed that the parties "have an agreement." On July 10, 2023, Phenix again emphasized that the parties "came to a mutual agreement to avoid any issues of a previous hook keeper."

90.     On information and belief, Phenix and the Equityholders, and each of them, through their agents, employees, and servants knowingly, intentionally, and willfully breached the Agreement on December 16, 2022 by declining to place an order and purchase products from Kigan.

91.     On or about March 12, 2024, GSM entered into an Agreement on behalf of Phenix when it expressed that it wished to have "a more cooperative and cordial relationship" with Kigan, that it was "eager to develop many new models for the Phenix brand," and that "Kigan can be an invaluable supplier for GSM," then asked about samples. GSM thus assured Kigan that Phenix would not only continue working with Kigan, but that its relationship would be improved.

92.     On information and belief, GSM first breached the Agreement on April 4, 2024 by declining to place an order and pay for samples from Kigan.

93.     On information and belief, Kigan did all, or substantially all, of the significant things that the Agreement required Kigan to do.

94.     By Defendants' breach of the Agreement, Kigan has been denied its expected benefits of the Agreement, namely that Defendants would cease unfairly competing with Kigan by infringing its design patent and illegally trading off of Kigan's goodwill embodied in the '733 Patent. Further, Kigan invested significant time, labor, and materials into developing samples for Phenix and GSM.

95.     Accordingly, Kigan is entitled to expectation damages in the amount of Kigan's lost profits for every Essex-branded Hook Keeper sold by Defendants.

96.     Due to the aforesaid breach of contract, which relates to intangible property rights, Kigan has suffered great and irreparable injury, for which Kigan has no adequate remedy at law.

97.     Defendants will continue to breach the Agreement by directly and/or indirectly infringing Kigan's patent rights, to the great and irreparable injury of Kigan, unless enjoined by this Court. Kigan has no adequate remedy at law.

98.     Accordingly, Kigan is entitled to both a preliminary and permanent injunction against Defendants enjoining them from further acts of infringement of the '733 Patent.

## COUNT III
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

99.     Kigan repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

100.     Implied in the Agreement is a covenant of good faith and fair dealing.

101.     Defendants breached the covenant of good faith and fair dealing implied in the Agreement by engaging in the conduct described above, including, but not limited to, only placing one order, and refusing to place the additional orders they promised they would, by assuring Kigan that they removed the Accused Product from its website, while still asking Kigan to develop multiple samples for Phenix and GSM, and by continuing to sell the Accused Product.

102.     As a result of Defendants' breaches, Kigan has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

## COUNT IV
## (IN THE ALTERNATIVE, BREACH OF A QUASI-CONTRACT/UNJUST ENRICHMENT)

103.     Kigan repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

104.     Alternatively, Defendants had a quasi-contract with Kigan whereby, Defendants have been unjustly enriched by the value of Kigan's efforts and investment into its samples for Defendants, as well as by Kigan's agreement to not file suit for Defendants' infringing actions. These samples were made in reliance on the Agreement and the understanding that Kigan would recoup its investment and benefit from that investment through orders placed in reliance on the Agreement.

105.     Kigan is entitled to restitution and disgorgement of all amounts by which Defendants were unjustly enriched.

## COUNT V
## <u>(FALSE ADVERTISING)</u>

106.    Kigan repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

107.    Based on the foregoing paragraphs, Defendants have made false or misleading statements regarding its commercial advertisements of the Accused Product on its website in violation of 15 U.S.C. § 1125(a).

108.    Defendants promised Kigan multiple times, as early as March 2022, and July 2022, that it had removed the infringing ESSEX-branded hook keeper from its products, and also its advertisements. However, Defendants offered and continue to offer the Accused Product for sale on its website. Defendants are advertising their products, which have Kigan hook keepers, as having Essex brand hook keepers instead. Defendants are deceiving customers into believing that Essex, and not Kigan, has provided the hook keepers on its products. This deception will likely influence consumers' purchasing decisions: it deprives Kigan of the advertising that would benefit Kigan if Phenix's website were to properly name Kigan. This will result in a diversion of sales away from Kigan from consumers who may wish to purchase Essex products based on their satisfaction with Phenix's casting rods.

109.    Defendants' commercially advertised Accused Product deceives, or had the capacity to deceive, consumers as to the origin of the Accused Product and misrepresents the nature, characteristics, and qualities of the Accused Product because it is substantially similar to the design that is the subject matter of the '733 Patent.

110.    Consumers were more likely to purchase the Accused Product due to its substantial similarity to the design that is the subject matter of the '733 Patent.

111.    Defendants advertised, and offered for sale, the Accused Product on its website, which is available to residents throughout the United States.

112.    Kigan has sustained damages as a result of Defendants' aforementioned acts of false advertising.

113.    Kigan is entitled to monetary relief against Defendants for Defendants' total profits, damages sustained, and costs of this action pursuant to 15 U.S.C. § 1117, in an amount to be proved at trial.

114.    Unless Defendants' acts are enjoined, Kigan will suffer irreparable injury for which there is no adequate remedy at law.

## COUNT VI
## TEXAS COMMON LAW FRAUD

115.    Kigan repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

116.    Defendants' acts constitute fraud under Texas common law.

117.    Phenix, and GSM, misrepresented that they wanted to develop a "good healthy" and "lasting relationship that benefits [both] of their companies." GSM misrepresented that they wanted a "more cooperative and cordial relationship" with Plaintiff. Both Defendants also continued to ask Kigan for samples without intention to purchase products as evidenced by the lack of response upon receiving samples. Defendants' statements were material and false, and they were made by both Defendants knowingly or recklessly without intent to develop an ongoing business relationship or purchase the sampled products.  Kigan justifiably relied upon these statements by making samples and forbearing in pursuing patent infringement claims because Phenix and GSM only initiated one nominal order as Defendants planned to induce reliance. Defendants did not have the intention to place the number of orders and develop the business

relationship that would establish an ongoing relationship with Kigan as promised. The statements were made to ensure that Kigan did not file a patent infringement claim against Defendants and the requests for samples were made to continue the reliance to the benefit of Defendants.

118.    The emails that the employees at Phenix sent each other serves as evidence that Defendants knew the promise of a relationship were false or recklessly made statements regarding a business relationship without regard for the truth. Defendants simply wanted to avoid Kigan's patent infringement suit, and deliberately deceived Kigan. For example, Mr. Estrabrook stated that a "[s]imple solution" to avoid infringement was to "buy five hundred of their hook keepers," while Mr. Borges stated that Phenix previously "bought like 1000 of his keepers…and [someone previously accusing Phenix of infringement] never bugged [Phenix] again."

119.    Defendants intended to induce Kigan's reliance on Phenix and GSM's claim regarding a business relationship to dissuade Kigan from filing a patent infringement claim against Defendants. Kigan then indeed relied on Defendants' claims, entered an Agreement with Defendants, and put forth significant time, labor, and materials toward developing samples for Phenix and GSM.  For several years, Kigan pursued a one-sided business relationship with Defendants, Defendants continued to infringe while Kigan held off on filing suit again Defendants.

120.    As a direct and proximate result thereof, Kigan has suffered substantial damage because of the time, labor, and materials it spent on preparing samples for Defendants, because of the lost sales of authentic products and goodwill due to the infringing sales, and because Defendants are still selling products that infringe Kigan's patents.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.  A judgment finding Defendants liable for infringement of the claims of the '733 Patent;

2. A preliminary and permanent injunction enjoining Defendants, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from making, using, selling, and/or offering to sell the Accused Products.

3. An Order that Defendants pay to Kigan actual damages of at least $1,000,000 in the form of lost profits, or in the alternative, other damages adequate to compensate for the infringement of Kigan's patents, but in no event less than a reasonable royalty for the use made of the '733 Patent by Defendants, in accordance with 35 U.S.C. § 284, including enhanced damages and/or, at Kigan's election, Defendants' total profits as a result of Defendants' infringement of the '733 Patent, pursuant to 35 U.S.C. § 289;

4. A judgment finding Defendants' acts of patent infringement have been willful;

5. A judgment finding Defendants liable for violation of § 1125(a) of the Lanham Act, specifically false advertising;

6. A judgment finding Defendants' false advertising under 15 U.S.C. § 1125(a) have been willful;

7. An award of damages adequate to compensate Kigan for Defendants' false advertising pursuant to 15 U.S.C. §§ 1117 and 1125, in an amount to be proven at trial;

8. An order of this Court requiring Defendants to undertake corrective advertising and other actions to remedy the false advertising;

9. An award of damages adequate to compensate Kigan for Defendants' breach of contract, in an amount to be proven at trial;

10. A judgment according to proof, against Defendants for disgorgement of profits under 35 U.S.C. § 289 and under 15 U.S.C. § 1117(a), and actual compensatory damages, adequate to compensate Kigan for all of its losses;

11. An award of Kigan's costs in bringing this action, pursuant to all applicable law, including at least 15 U.S.C. § 1117 and 35 U.S.C. § 284;

12. An Order adjudging that this case is exceptional under 35 U.S.C. § 285 and ordering Defendants to pay to Kigan its reasonable attorney fees incurred in this action;

13. An Order awarding pre-judgment and post-judgement interest and costs as fixed by the Court for Defendants' acts of patent infringement;

14. That Defendants be directed to file with this Court and serve on Kigan within thirty (30) days after the service of the injunction, a report, in writing, under oath, setting forth in detail the manner and form in which it has complied with the injunction pursuant to 15 U.S.C. § 1116;

15. That the Court award Kigan its reasonable costs, expenses, and attorneys' fees pursuant to at least 15 U.S.C. § 1117;

16. That the Court render a final judgment that Defendants have violated the Texas Deceptive Trade Practices Act by falsely designating the origin of its goods, passing of its goods as Kigan's, and unfairly competing with Kigan;

17. Such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Kigan hereby demands and requests trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated:  June 5, 2025    BY: */s/ Nicole Sims (with permission of Erica J. Van Loon)*

Erica J. Van Loon
Bar No. 227712
*pro hac vice forthcoming*
Nixon Peabody LLP
300 South Grand Avenue, Suite 4100,
Los Angeles, CA 90071-3151
Telephone: (310) 740-1565
Facsimile: (213) 629-6001

**ATTORNEY-IN-CHARGE FOR THE PLAINTIFF, KIGAN INDUSTRY CO. LTD.**

**OF COUNSEL:**

Nicole Sims
TX Bar No. 24051343
Nixon Peabody LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327*
Telephone: 202.585.8337
Facsimile: (833) 723-2717